UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KURT PETERSON<br><br>Defendant. | Case No. 1:21-cr-427-CJN<br><br>Sentencing Hearing: November 2, 2023 |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kurt Peterson to three months of incarceration, one year of supervised release, $4,700 in restitution, and a $100 special assessment. A three-month sentence is the midpoint of the advisory Guidelines range of zero to six months.

**I.    INTRODUCTION**

The defendant, Kurt Peterson, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

On January 6, 2021, Peterson carried a pointed wooden stick onto Capitol Grounds and then used that stick to shatter an exterior window of the U.S. Capitol Building. As he broke the window, he chanted, "This is our house! Let us in! Our house!" Peterson then unlawfully entered the U.S. Capitol Building at approximately 2:42 p.m., after having been sprayed with chemical irritants outside of the building. Within the Capitol, Peterson walked to an area known as the Speaker's Lobby and was present when lethal force was deployed to stop an individual who was attempting to enter the House Chamber. During the ensuing panic, the defendant attempted to get closer to the decedent and the officers attending to her. Open-source videos show the defendant attempting to speak with officers, and he later posted to Facebook that he was attempting to assist by giving law enforcement first aid equipment. Yet at the time, officers were giving verbal commands to clear the area to allow for first responders to render aid. The defendant did not leave the Capitol Building until after approximately 2:56 p.m. when Metropolitan Police Department (MPD) officers cleared the Speaker's Lobby.

The government recommends that the Court sentence Peterson to three months of incarceration for violating 18 U.S.C. § 1752(a)(4) and (b)(1) (Act of Physical Violence within Restricted Grounds using a Deadly or Dangerous Weapon), which is at the midpoint of the advisory Guidelines' range of zero to six months. A three-month sentence reflects the gravity of Peterson's conduct, but also acknowledges his early admission of guilt and cooperation with the government's investigation.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II. FACTUAL BACKGROUND

### A. The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 47, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B. Kurt Peterson's Role in the January 6, 2021 Attack on the Capitol

Kurt Peterson, a retired engineer, participated in the January 6 attack on the Capitol and contributed to the destruction inside the Capitol Building. On the morning of January 6, 2021, Peterson attended former President Trump's speech at the ellipse after travelling to Washington, D.C. from his home in Hodgenville, Kentucky by car. Peterson was wearing a camouflage-patterned vest with pockets, a black sweatshirt, a neck gaiter, a camouflage-patterned baseball cap, black gloves, and safety goggles.

 

*Images 1 (still from MPD BWC) and 2 (still from Ex. 1) depicting Peterson's clothing on January 6, 2021*

After the former President's speech, Peterson walked towards the Capitol Building, where law enforcement officers were using non-lethal munitions to deter the rioters, including Peterson. Undeterred by the non-lethal munitions deployed by law enforcement, Peterson approached the building and used a pointed, wooden stick to break through a window of the building. As he broke the window, he chanted, "This is our house! Let us in! Our house!"



*Image 3 (still from Sent. Ex. 1): Peterson (far left, circled in red) approaches the Capitol as another rioter begins to break through the window pane*

4



*Image 4 (still from Ex. 1): Peterson (left, circled in red) raises his stick to break the left-most window pane, as another rioter uses his fist to bang on the right window pane*



*Image 5 (still from Ex. 1): Peterson uses his fist to bang on the left window pane*



*Image 6 (still from Ex. 1): Peterson uses his fist and elbow to punch the broken glass through the window*

Peterson then entered the Capitol Building at approximately 2:42 p.m.



*Image 7 (still from USCP CCTV): Peterson (circled in red) entering the U.S. Capitol Building*

Once inside, Peterson went to the Speaker's Lobby and witnessed the police use lethal force to deter an individual attempting to enter the House Chamber.



*Image 8 (still from an open source video): Peterson attempting to converse with officers while officers attempt to attend to the decedent, who was on the floor behind the officer in the foreground of this screenshot*

7



*Image 9 (still from an open source video): Peterson conversing with officers as officers attempt to attend to the decedent and give instructions to clear the area*



*Image 10 (still from open source video): Peterson (circled in red) outside the Speaker's Lobby minutes after police shot another rioter*

Peterson remained in the Capitol Building until he was forced out by responding Metropolitan Police officers, who cleared the Speaker's Lobby at approximately 2:56 p.m.

***Peterson's Statements***

Following the riot, on January 9, 2021, Peterson posted to Facebook the following message:

> To my family and friends who are able to see this, I am writing it with a voice recognition program while driving. I feel the need to keep moving and trying to keep my phone wrapped such that it can't be traced most of the time. I was at our nation's capital for the rally and watched the presentations at the ellipse prior to walking to the Capitol building with at least a million and a 1-1/2 to 2 million people.
>
> The people that were there at the ellipse were peaceable and loving and supporting our country. The people that were at the capital were also primarily peaceful and loving our country. But when there are huge crowds and there are people that are inciting violence the crowds will many times be pulled in to this action.
>
> I was with 3 men who had served our country in special forces. All of us in our sixties. They were patriots and not an anarchists. When at the back door that we were at open and there were no police to restrain the crowd many people entered at that time. I stood at the door and told everyone that we were not there to hurt anybody or damage anything but as a show of solidarity to right the wrongs of the past election.
>
> I did stop some men from trying to break down the large wooden doors to the house chamber. Then I saw chairs being brought into the corridor going to the speaker's lobby. They also grabbed a large sign with a heavy metal base stating no photography. I pushed into the corridor yelling for them to stop trying to break through the doors in to the speaker's lobby. The woman who was shot used the leg of a chair to hit a glass panel in the door. There were numerous police officers in the stair tower and hallway that I was in.
>
> Before I could get to her the shot rang out from behind the doors in the speaker's lobby through the glass which shattered hitting many please officers and people there. It was a young man in a suit who was supposedly a bodyguard for Chuck schumer.
>
> The bullet hit the woman in the neck which caused her to fall backwards amediately. It could have hit numerous pleas officers that were there. Non lethal force could have been use with out the lethal shot that was made by this body guard in the speaker's lobby.
>
> I had my 1st aid deer with me and asked numerous times to be allowed to render

> 1st aid to this woman while she was bleeding on the floor. I was told that they were waiting for the fire department to Russ pond and they would not let me give her 1st aid. She died on the floor within 10 minutes of the shot being made. The crowd became agitated but I yell the loudly and said we were all going to pray at that moment for everyone and volved which we did.
>
> Sadly I do not trust many branches or people in our government particularly the federal bureau of investigation. So at this time I am moving continuously and wrapping my phone in such a way that I hope it cannot be tracked. If for any reason I am not available to see you or meet with you again know that my intentions are to keep our country free of oppression by an over zealous government.
>
> God-bless you all and God-bless the United States of America!

Statement of Facts, Doc. 1-1 at 2-3 (typographical errors in original posting by Peterson). Notably, his statement falsely disclaims the property damage he caused. And although his statements that he attempted to provide police with first aid gear after a rioter was grievously injured, video of the minutes after the rioter was shot show law enforcement attempting to clear the area. Peterson did not initially respond to directives to leave and instead remained in the crowded hall, making it more difficult for first responders to render aid.

### III. THE CHARGES AND PLEA AGREEMENT

On September 21, 2022, the United States charged Peterson via a one-count Superseding Information with Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A). That same day, Peterson was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

### IV. STATUTORY PENALTIES

Peterson now faces sentencing on Count 1 of the Superseding Information charging him with Engaging in Acts of Physical Violence within a Restricted Building or Grounds, in violation of 1752(a)(4). Penalties include up to 10 years of imprisonment, a term of supervised release of

not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 (Plea Agreement, Doc. 46; PSR, Doc. 57).

V.     **THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the PSR that Peterson's base offense level is 4 under U.S.S.G. § 2B2.3(a). Two levels are added because Peterson trespassed in a restricted building. U.S.S.G. § 2B2.3(b)(1)(A)(vii). An additional two levels are added because Peterson possessed a dangerous weapon. U.S.S.G. § 2B2.3(b)(2). Peterson's offense level is decreased by two levels, because he has demonstrated acceptance of responsibility for his conduct. U.S.S.G. § 3E1.1(a). Accordingly, Peterson's total offense level is 6. The government further agrees with the PSR that Peterson is in Criminal History Category I. Based on a total offense level of 6 and a Criminal History Category I, Peterson's advisory Guidelines range is zero to six months, within Zone A of the Sentencing Table. *See* Plea Agreement, Doc. 46 at 2-4; PSR, Doc. 57, ¶¶ 40-49, 52, 80, 82.

VI.     **SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a months-long term of incarceration.

     A.     **Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Peterson's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United

States into a Constitutional crisis. Peterson unlawfully entered the Capitol Building after using a dangerous object to smash through a window of the building. And although Peterson may have had benevolent intentions of providing aid to a grievously injured rioter, he ultimately disobeyed police orders to disperse, adding to the chaos of the situation outside of the Speaker's Lobby and hindering first responders' ability to render aid to that rioter. The nature and circumstances of Peterson's offense were of the utmost seriousness, and fully support the government's recommended sentence of three months of incarceration.

### B.  The History and Characteristics of the Defendant

Peterson is a 67-year-old Kentuckian. He is retired, but he most recently worked as a mechanical superintendent for a railroad company and as a healthcare engineer before that. PSR ¶¶ 73-74. In 2014, he was charged with two misdemeanor counts for disorderly conduct and resisting arrest, but those charges were eventually disposed of without a finding of guilt. *Id.* ¶ 54.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Peterson's criminal conduct on January 6 was the epitome of disrespect for the law. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by

others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

Peterson's actions during the riot show the need for specific deterrence. The government acknowledges that Peterson took responsibility for his actions early in his prosecution and was willing to and did assist the United States in its investigation of the events of January 6, 2021. At the same time, Peterson's actions on January 6, and candid statements in the immediate aftermath, evidence a mindset that might lead him to the same choices if a similar situation arises in the future. He broke a window and entered the Capitol Building, despite clear police attempts to deter him and other rioters. And in the height of the panic after a shooting within the Capitol, the defendant failed to follow police directives. With the 2024 presidential election approaching, the potential for a repeat of January 6 looms large. The government respectfully recommends that the Court sentence Peterson in a manner sufficient to deter him specifically, and others generally, from going down that road again.

E.     **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

      **F.**    **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

14

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

15

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[4]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

First, consider *United States v. Troy Elbert Faulkner*, 21-cr-126-BAH. There, the defendant participated in the riot at the Capitol and ultimately pled guilty to violating 18 U.S.C. § 1361 (destruction of government property), specifically for kicking out a window of the U.S. Capitol Building. Though he pled guilty under a different statute, his conduct was similar to Peterson's, and he faced a similar Guidelines range of two to eight months based on an adjusted offense level of six and criminal history category III. *See United States v. Faulker*, 21-cr-126-BAH, Govt Sent. Mem., Doc. 47 at 3-8 (describing Faulkner's offense), 10-11 (describing Guidelines analysis). Faulkner also turned himself in relatively early on in the government's investigation and acknowledged his conduct in breaking through the window. *See id.* The government recommended a term of imprisonment of five months, which the Court imposed. *See id.* at 20; Judgment, Doc. 53. The Court also imposed a term of supervised release lasting thirty-

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

16

six months and restitution in the amount of $10,560.00. Here, the government is recommending a lower sentence to reflect the defendant's cooperation.

Similarly, defendant Hunter Ehmke participated in the riot at the Capitol and pled guilty to violating 18 U.S.C. § 1361 (destruction of government property), specifically for kicking and punching out multiple windowpanes of a window on the East Front of the U.S. Capitol Building. *See United States v. Hunter Ehmke*, 21-cr-29-TSC, Govt Sent. Mem., Doc. 31 at 6-10 (describing Ehmke's offense). Like Peterson, Ehmke faced a guidelines range of zero to six months, and the government recommended a term of four months incarceration, which the Court imposed. The Court also imposed a term of supervised release lasting thirty-six months and restitution in the amount of $2,281.00. Here, the government is recommending a slightly lower sentence to reflect the defendant's cooperation.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5]

Here, Peterson's restitution is due under the Mandatory Victims Restitution Act, because his crime of conviction qualifies as an offense against property. The Mandatory Victims

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

17

Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Peterson must pay $2,000 in restitution, which reflects in part the role Peterson played in the riot on January 6.[6] Plea Agreement, Doc. 46 at 9-10. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,732,783.14" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of September 2021 when the plea was entered. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP,

---

[6] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

and MPD.) In addition, Peterson agreed to pay $2,700 in restitution to the Architect of the Capitol for his damage to the window he broke. *See id.* Peterson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

## VIII. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of three months of incarceration, a one-year term of supervised release, $4,700 restitution, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY: */s/ Katherine E. Boyles*
Katherine E. Boyles
Assistant U.S. Attorney
D. Conn. Fed. Bar No. PHV20325
United States Attorney's Office
601 D Street NW Washington, D.C. 20001
Phone: 203-931-5088
Email: Katherine.Boyles@usdoj.gov